**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| PRIORITY 1 AUTOMOTIVE GROUP, INC. d/b/a BMW OF TOWSON, | **Case No.: 1:24-cv-6844** |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CDK GLOBAL, LLC, | |
| Defendant. | |

Plaintiff Priority 1 Automotive Group, Inc. d/b/a BMW of Towson ("Priority 1"), by and through its undersigned attorneys, for its complaint against CDK Global, LLC ("CDK"), hereby alleges as follows:

**NATURE OF THE ACTION**

1.      CDK provides software to auto dealerships, which manages every aspect of their operations.  This software is the lifeblood of a dealership.  Changing the system, once installed, has been likened to a heart transplant.  The Reynolds and Reynolds Company ("Reynolds") is another technology company that provides the same type of software as CDK.  Dealers also rely on specialized third-party software products for certain aspects of their business.  Those third-party products must be able to access, or integrate with, the dealer's core software system.

2.      In or about 2007, Reynolds implemented a scheme, under the guise of data security, by which it permitted third-party data integration, but <u>only</u> through its program, and by charging the vendors inflated prices to integrate.  Years later, CDK decided to copy Reynolds.  In 2015, CDK announced its SecurityFirst initiative, which mirrored Reynolds' earlier program.  CDK monitored its clients' systems and, if a third-party vendor was not enrolled in the CDK

program and paying the inflated fees, CDK cut off access to the dealer's system. The third-party vendors were forced to pass on CDK's data access fees to the dealers. The backlash was severe.

3. In 2017, dealers and third-party software vendors across the country began filing lawsuits against CDK (and Reynolds). In 2018, these actions were consolidated into a massive multidistrict litigation. In addition, at least four states enacted statutes prohibiting the exact conduct engaged in by CDK. CDK sought a preliminary injunction against the enforcement of one of the statutes. CDK's request was denied by the district court in Arizona and then the Ninth Circuit. In 2022, CDK announced it was transitioning away from SecurityFirst.

4. Priority 1 is a group of dealerships in Maryland. Unlike other dealers, Priority 1's software contracts with CDK were negotiated and prepared by Jane Copeland, a software consultant who has 40 years of industry experience. Indeed, Priority 1's contracts contain "non-standard" language, which expressly forbid CDK from "us[ing]" Priority 1's data "to create or supply revenue generating services" without Priority 1's written consent. This language was prepared by Ms. Copeland in direct response to Reynolds' earlier data integration program and was intended to protect dealers (like Priority 1) from similar programs in the future (like CDK's SecurityFirst).

5. CDK "used" Priority 1's data because—without the data—CDK had nothing to "protect". CDK's daily provision of "security" services through SecurityFirst were ongoing breaches of Priority 1's agreement. CDK regularly charged fees to Priority 1's third-party vendors to enable them to integrate with Priority 1's system. And the vendors, in turn, passed on those fees to Priority 1 who had no choice but to pay them. Priority 1 attempted to deduct those charges from its regular payments to CDK, but ultimately could not risk having its mission-critical software be turned off in an act of retaliation. CDK further breached the parties'

agreements by prohibiting Priority 1 from providing its third-party vendors with a user ID and password to log into its system (as it had always done). Instead, the third-party vendor was required to be enrolled through CDK's eStore and could only gain access to Priority 1's system through the CDK program and by paying the inflated fees.

6.      Priority 1 brings this action seeking monetary damages resulting from CDK's breaches of its obligations under the agreement or, in the alternative, its unjust enrichment.

## PARTIES

7.      Priority 1 is a Maryland corporation with its principal place of business in Hunt Valley, Maryland.

8.      On information and belief, defendant CDK is a Delaware limited liability company with its principal place of business in Hoffman Estates, Illinois, and was formerly known as ADP Dealer Services. On information and belief, all of CDK's members are citizens of Delaware or Illinois.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.      This Court has personal jurisdiction over CDK because, on information and belief, CDK resides and/or may be found in Illinois, does business in Illinois, and has committed wrongful acts within Illinois. In addition, CDK is licensed to do business in Illinois as a foreign limited liability company and has initiated litigation in this District.

11.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c).

## FACTUAL ALLEGATIONS

**A.**     **Auto Dealer Software**

12.     A dealer management system ("DMS") is a computer system made up of hardware and software, typically used by auto dealerships and large equipment manufacturers, which support all aspects of running the business.  Auto dealers also rely on specialized add-on software programs provided by third-party vendors.  In order to function, the third-party applications must be able to access the data stored in a dealer's DMS.  Historically, dealers and third-party software vendors were allowed to program their own data exchange integrations between themselves and the DMS.

**B.**     **The Parties and Jane Copeland**

13.     CDK provides DMS software and services.  At all relevant times, Priority 1 was a group of dealerships in Maryland.  Jane Copeland is a DMS consultant.  Ms. Copeland has 40 years of DMS industry experience.  Since in or about 1983, Ms. Copeland has assisted over a thousand dealers with various DMS-related issues, including, but not limited to, negotiating their DMS contracts directly with the vendors.

**C.**     **The History of the "Jane Copeland Addendum"**

14.     As automotive technology, trends, and data security requirements changed, Ms. Copeland created new DMS contract language to protect the dealers and their data.  The language used in Ms. Copeland's DMS contracts evolved over time in response to DMS vendor business practices and technology changes.

15.     In 2007, Robert Brockman, through his company Universal Computer Systems, Inc. ("UCS"), purchased Reynolds.  Reynolds is another company that provides DMS software and services.  In his quest for more DMS revenue, and under the guise of data security, Mr.

Brockman began to change the Reynolds DMS contracts and gradually removed DMS functionality, which dealers relied on to create automated data exchanges between their franchisors or original equipment manufacturers ("OEMs") and their third-party software providers.[1]

16.     Many third-party vendors were allowed to use data exchange facilities until Reynolds decided they wanted to monopolize that service to the exclusion of all others.  At that point, the OEM or third-party vendor had to negotiate with Reynolds and pay the fees to access the data stored in a dealer's DMS in order to continue to operate.

17.     Over time, many third-party vendors were unable to interact with the Reynolds DMS and dealers had to abandon the third-party software applications and services they had invested in.  While several third-party software vendors went out of business, others were limited to offering their services to only those dealers using non-Reynolds DMSs, which allowed easy and inexpensive application programming interface ("API") integration.

18.     In connection with its initiative, Reynolds electronically monitored DMSs to identify any data being exchanged.  Those entities found not paying Reynolds for the data were often surprised when their system accounts were deleted without prior warning.  These restrictions were not confined to vendor data exchanges.

19.     Reynolds also took aim at dealers who had created in-house custom programs, which they relied on for data exchanges with the Reynolds DMS.  Even dealers using their own data were prevented from using their own automated data exchanges.

---

[1] Before he died in August 2022, Mr. Brockman was awaiting trial on charges that he concealed more than $2 billion from the IRS in what has been called the biggest individual tax fraud case in U.S. history.  *See* https://www.wsj.com/articles/billionaire-robert-brockman-accused-of-biggest-tax-fraud-in-u-s-history-dies-at-81-11660226505.

20.     There was a huge industry outcry over the change in business tactics because Reynolds' actions caused significant business interruptions.  Dealers and OEMs were given no choice but to comply with Reynolds' data access fees to continue their operations.  Consequently, many dealers moved from Reynolds to another DMS when their Reynolds contracts expired.  In fact, CDK (then known as ADP Dealer Services, Inc.) was a primary beneficiary of these dealer moves because, at that time, CDK still allowed dealers to exchange data with third-party software vendors using the inherent programming functionality of the CDK DMS.  OEMs and dealers invested in building systems around the CDK DMS to augment and enhance their operations using these facilities.

21.     In 2009, in direct response to the data access fees and usage limitations imposed on dealers using the Reynolds DMS, Ms. Copeland began to introduce new DMS contract language to ensure dealers maintained their data rights when using other DMSs.  This language evolved as technology changed and new data concerns were identified.  The addendum language Ms. Copeland developed to protect the dealers' data rights and DMS programming functionality in CDK DMS contracts was designed to specify and protect the following principles:

- Dealers own their data and CDK has no rights to a dealer's data;

- Any data entered into the CDK DMS during the course of using the DMS to conduct a dealer's business operations is the property of the dealer;

- CDK may not use dealer data in any form to create revenue generating services;

- If the dealer paid CDK for any data cleansing, compilation, or other data services, the resulting data is the property of the dealer;

- Dealers maintain the right to give login credentials to a third-party to use or extract dealer data from the CDK DMS using the programming facilities inherent to the CDK DMS;

- Dealers maintain their rights to use the CDK programming facilities to exchange data with supplemental dealer and third-party programs; and

6

- CDK must obtain prior written consent from the dealer before supplying any dealer data to another party.

22.     CDK's employees commonly refer to Ms. Copeland's addendum as the "Jane Copeland Addendum", and it is included in a CDK DMS contract every time Ms. Copeland is negotiating on behalf of a dealer.

**D.      The Contractual Relationship Between Priority 1 and CDK**

23.     Ms. Copeland assisted Priority 1 with its DMS contract negotiations with CDK. Effective February 4, 2010, Priority 1 entered into a Master Services Agreement (the "MSA") with CDK, pursuant to which CDK agreed to provide DMS software to Priority 1. Effective February 2, 2010, Priority 1 and CDK entered into a version of the Jane Copeland Addendum (the "2010 Addendum"), which CDK considers to be a "non-standard" addendum.

24.     The 2010 Addendum provides in relevant part:

- "[CDK] shall have no ownership interest in any [Priority 1] data generated by [Priority 1] through the use of the [CDK DMS]."

- "[CDK] will not use any of the [Priority 1] data to create or supply revenue generating services without [Priority 1's] written consent."

- "[CDK] acknowledges that [Priority 1] may provide a third party vendor with a user id and password into [Priority 1's CDK DMS] to allow routine screen scrape [*i.e.*, data extraction] of the DMS and the use of a report generator."

25.     Effective December 9, 2015, Priority 1 and CDK entered into another version of the Jane Copeland Addendum (the "2015 Addendum"), which provides in relevant part:

- "[CDK] shall have no ownership interest in any [Priority 1] data generated by CDK or [Priority 1] through the use of the CDK [DMS]."

- "CDK will not use any of the [Priority 1] Data to create or supply revenue generating services without [Priority 1's] written consent."

- "CDK acknowledges that [Priority 1] may provide a third party vendor with a user id and password into [Priority 1's CDK DMS] to allow routine data or extraction from the DMS and the use of a report generator."

7

26.     On July 26, 2017, Priority 1 entered into a third addendum (the "2017 Addendum"), which incorporates all of the terms of the 2015 Addendum by reference.  Effective May 3, 2018, Priority 1 and CDK entered into a fourth version of the Jane Copeland Addendum (the "2018 Addendum" and together with the 2010 Addendum, the 2015 Addendum, and the 2017 Addendum, the "Addenda").  The 2018 Addendum contains the identical language from the 2015 Addendum quoted above.  The MSA and Addenda are attached as Exhibits A-E.

     **E.     CDK Takes a Page from Reynolds' Old Playbook**

27.     The CDK DMS originally provided clients with a facility called User Programming and other internal programming and reporting capabilities, such as RPG and TCL. Dealers, OEMs, and third-party software vendors relied on those capabilities to augment the CDK DMS with the enhanced capabilities needed to meet their growing operational sophistication and required data exchange needs.  However, as DMS competition heated up, this would change.

28.     In or about early 2014, in an improper attempt to increase revenue and make CDK more attractive for a spin-off or IPO, CDK gradually introduced a series of functionality and contract changes to its client base, which forced dealers and third-party vendors to pay CDK for the interaction and use of dealer data.[2]  System changes—introduced via system updates— removed the functionality that been utilized by dealers and OEMs for many years.  Dealer user IDs, utilized to facilitate some of the data exchanges, were often removed without warning, thus forcing the dealers or OEMs to enter into a CDK data exchange program known by various names, *e.g.*, "3PA" and "SecurityFirst".

---

[2] CDK was spun off from ADP on or about September 30, 2014.

29.    Like Reynolds, CDK cited data security as the reason for their new data access fees.  Nonetheless, CDK continued to use its previous data exchanges without implementing any additional security measures.  For example, if a third-party vendor paid the fee to have access to service repair order data, CDK gave the vendor access to <u>all</u> of the data in that data set, instead of limiting the data provided to only those fields needed by the vendor for its business purpose.

30.    In addition, some third-party vendors were not permitted to participate if CDK viewed them as competitors in a market space CDK wished to dominate or expand into.

**F.    <u>Priority 1 Becomes Aware of SecurityFirst</u>**

31.    In 2015, CDK announced its SecurityFirst initiative.[3]  (David Barkholz, *Dealers will pay up for vendors' data access after CDK switch*, Automotive News (July 20, 2015) at https://www.autonews.com/article/20150720/RETAIL07/307209962 ("CDK Global is copying the vendor-certification program of rival Reynolds and Reynolds, portending big monthly cost increases to dealers for data security…CDK said the program is part of an initiative, called SecurityFirst, to better protect customer data from falling into unauthorized hands.  But the vendors in the CDK program lament that they plan to pass those extra costs on to their dealer customers.  They say the costs being charged far exceed the value of any increased data security.").)

32.    In or about 2016, Priority 1 began receiving complaints and written notices from its third-party vendors indicating that they had no choice but to utilize the CDK integration program and pass on the new data access fees levied by CDK to Priority 1.

---

[3] According to CDK, the SecurityFirst initiative represented security enhancements to its Third-Party Access (3PA) Program, which had been in existence since early 2000.

33. Prior to 2015-2016, Priority 1 was <u>not</u> aware that CDK was charging integration or access fees.

34. In addition, prior to 2015-2016, Priority 1 provided log-in credentials (*i.e.*, user IDs and passwords) to its third-party vendors for data integration—without having to enroll in a CDK data exchange program.

35. Starting in 2015-2016, however, if a third-party vendor was not enrolled in the CDK program through its eStore and paying the inflated fees to CDK, the vendor would not be permitted to access the data stored on a dealer's DMS and CDK would cut off any existing access.

36. By letter dated June 29, 2016, Priority 1 alerted CDK that its SecurityFirst initiative breached the 2015 Addendum: "Over the past few months we have received numerous notifications from third-party vendors indicating their charges to us will be increased. The reason stated for the increase is that CDK has created a new service which requires third-parties to pay additional fees to CDK in order to maintain the services they provide to us. This new arrangement between CDK and third-party vendors was instituted without our written consent." Priority 1 informed CDK that it intended to deduct the third-party pass-through fees from its monthly payments to CDK until CDK corrected the issue.

37. Although Priority 1 started to short pay its monthly CDK invoices to offset the integration fees, it ultimately decided to pay CDK, under protest, so that its DMS would not be shut down.

38. By letter dated November 22, 2016, Priority 1 informed CDK that it continued to breach the 2015 Addendum by (i) decreeing that its data exchange program was the "only CDK-approved method of accessing dealership data on the CDK DMS"; (ii) requiring all vendors to

participate in its data exchange program if they wished to continue providing services to Priority 1; (iii) charging fees to Priority 1's vendors to obtain 3PA Program certification as well as access and integration with Priority 1's data; and (iv) repeatedly disabling user IDs and passwords provided to Priority 1's vendors.  Priority 1 again demanded that CDK cease and desist engaging in the foregoing activities.  Priority 1's in-house counsel subsequently had a telephone conversation with CDK's in-house counsel who indicated that CDK may provide a credit for the integration fees, but no credits were issued.

39.     Upon receiving Priority 1's November 22, 2016 letter, CDK's then-President Robert Karp forwarded it to Mayer Grashin (CDK's Litigation Counsel) and others at CDK.  The emails were also forwarded to CDK employee Mike Noser who confirmed that CDK had been disrupting third-party access to Priority 1's DMS.

40.     Before Priority 1 was placed on a certain list of usernames not to be disturbed, CDK was disrupting third-party access to Priority 1's DMS.

41.     CDK monitors its clients' DMSs and tracks third-party access and the level of disruption employed.

42.     In response to Priority 1's November 22, 2016 letter, CDK also prepared an analysis of the third-party integration fees charged to Priority 1's vendors.  Mr. Noser prepared the fee analysis at the request of CDK's Litigation Counsel, Mr. Grashin, in or about early December 2016.

43.     In preparing his analysis of Priority 1's third-party access fees, Mr. Noser reviewed a list of Priority 1's dealerships and CDK's invoices issued to Priority 1's vendors.  Mr. Noser sent the information to Howard Gardner, the leader of CDK's Data Services Group.

44.     Like Reynolds, CDK monitored its clients' DMSs daily and utilized lockdown services to disrupt vendors' access to DMSs.  However, CDK re-enabled Priority 1's inactivated users pursuant to the Jane Copeland Addendum.

45.     Nonetheless, CDK continued to charge data access fees to Priority 1's third-party vendors.  The third-party vendors passed those charges on to Priority 1.

46.     Priority 1 had no choice but to pay the vendors' pass-through fees, as well as CDK's invoices for the DMS.

47.     Besides the fact that Priority 1 was mandated to utilize certain vendors by its OEMs, permanently turning off the DMS and/or third-party integration would have devastating effects on Priority 1's business, as the DMS and third-party software were crucial to Priority 1's daily operations.

48.     In addition, when Priority 1 enrolled its third-party vendors into CDK's 3PA program through the eStore (which was now mandatory under SecurityFirst), Priority 1 would insert language to preserve its rights under the Jane Copeland Addendum.

49.     CDK accepted Priority 1's contract language submitted through the eStore.

**G.     <u>Lawsuits Against CDK</u>**

50.     After introducing and implementing its SecurityFirst initiative in 2015, CDK faced an angry backlash from the industry.

51.     Starting in or about 2017, dealers and third-party vendors across the country began to file suit against CDK and Reynolds.  On February 1, 2018, the U.S. Judicial Panel on Multidistrict Litigation found that these actions should be centralized in the Northern District of Illinois because they "share factual issues arising from allegations that [CDK] and [Reynolds] illegally (1) used their purported dominance in the [DMS] marketplace to force motor vehicle

dealerships to enter into long-term DMS contracts at artificially inflated prices, (2) blocked data integrators (such as plaintiff in *Authenticom*) from accessing dealer data, (3) tied the provision of data integration services to the supply of DMS, and (4) used their control of data integration services to impose exclusive dealing restrictions on vendors (*e.g.*, prohibiting vendors from using other data integration providers, and charging vendors inflated prices from data integration)."

52.     On February 12 and February 14, 2018, additional cases were transferred and reassigned as potential tag-along actions to the Northern District of Illinois.  Approximately 23 cases were consolidated into the lead case entitled *In re: Dealer Management Systems Antitrust Litigation*, No 1:18-cv-864 (N.D. Ill.).  These cases have been heavily litigated and some of them are ongoing.  On June 29, 2023, the district court granted the auto dealers' motion for summary judgment on CDK's counterclaims and denied CDK's motion for summary judgment on the dealers' claims, in part.

53.     As stated by the President of the California New Car Dealers Association, "[u]nlike in the past, both CDK and Reynolds now block dealers from using independent integrators like Authenticom from providing access to the dealers' own data" and "[t]his is one of the biggest issues facing dealers today.  Having eliminated competition, CDK and Reynolds have drastically increased the fees they impose on application providers for access to dealer data, and those application providers in turn pass on a portion of the fees to dealers."[4]

---

[4] On March 19, 2018, the Federal Trade Commission ("FTC") sued CDK for planning to (i) purchase Auto/Mate, Inc. ("Auto/Mate"), a growing competitive threat in the DMS market; and (ii) post-acquisition, downgrade Auto/Mate's DMS features and service, raise prices, and ultimately remove Auto/Mate's DMS as a competitive alternative to CDK's DMS.  On March 26, 2018, the FTC voluntarily dismissed its Administrative Complaint without prejudice because CDK and Auto/Mate decided to abandon the proposed acquisition.

**H.** **Legislation Targeting CDK and Other DMS Providers**

54.     CDK also faced legislative backlash to its SecurityFirst initiative.

55.     Indeed, several states enacted laws prohibiting the <u>exact</u> practices prohibited by the Jane Copeland Addendum.

**Arizona**

56.     In 2019, the Arizona Legislature enacted a statute to ensure that dealers retain control over their data.  The statute prohibits DMS providers (*e.g.*, CDK) from "tak[ing] any action by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use" data the dealer has stored in its DMS.  (Ariz. Rev. Stat. Ann. §§ 28-4651(7), 28-4653(A)(3).)  DMS providers (*e.g.*, CDK) may not impose charges "beyond any direct costs incurred" for database access.  (*Id.* §§ 28-4651(5), 28-4653(A)(3)(a).)  As long as a third-party integrator complies with industry security standards, DMS providers (*e.g.*, CDK) may not prohibit the third party "from integrating into the dealer's data system" nor may they "plac[e] an unreasonable restriction on integration."  (*Id.* §§ 28-4651(1), (9), 28-4653(A)(3)(b).)

57.     The Arizona statute also requires DMS providers (*e.g.*, CDK) to allow integration and sharing of data using an API or "'a similar open access integration method.'"  (*Id.* §§ 28-4654(A)(1), (A)(2).

58.     In response, CDK and Reynolds sued the Attorney General of Arizona and sought a preliminary injunction against the enforcement of the Arizona statute on the grounds that it is unconstitutional and that it is preempted by numerous federal statutes.  After concluding that CDK and Reynolds were unlikely to succeed on the merits of their claims, the district court denied a preliminary injunction.  CDK and Reynolds appealed the decision and the Ninth Circuit affirmed on October 25, 2021.

**Oregon**

59.     Effective November 15, 2019, the Oregon Legislature enacted a statute prohibiting DMS providers from "tak[ing] any action that would limit or prohibit a dealer's or an authorized integrator's ability to receive, protect, store, copy, share or use protected dealer data using means that include, but are not limited to…[i]mposing an access fee on a dealer or authorized integrator… [or] [r]estricting a dealer or an authorized integrator from sharing protected dealer data or writing data or having access to a dealer data system."  (O.R.S. § 650.123(3)(a)-(b).)

**North Carolina**

60.     Effective May 1, 2021, the North Carolina legislature amended one of its statutes to make it "unlawful for any [DMS] vendor [to]…[u]nreasonably interfere with a dealer's ability to protect, store, copy, share, or use any dealer data downloaded from a [DMS]…[i]mpos[e] any unreasonable fees or other restrictions on the dealer or any third party for access to or sharing of dealer data…impose unreasonable restrictions on secure integration by any third party that the dealer has explicitly authorized to access its [DMS] for the purpose of accessing dealer data…[and] [a]cess, use, store, or share any dealer data from a [DMS] in any matter other than as expressly permitted in its written agreement with the dealer", among other things.  (N.C.G.S.A. § 20-305.7(b1)(1)(a), (b1)(1)(b), and (b1)(2).)

**Montana**

61.     Effective May 2, 2023, the Montana legislature enacted a statute providing that a "third party"[5] may not "access, share, sell, copy, use, or transmit protected dealer data from a

---

[5] "'Third party' includes…dealer data vendors."  (M.C.A § 30-11-717(11)(a).)  "'Dealer data vendor' means any dealer management system provider."  (M.C.A § 30-11-717(5).)

[DMS] without the prior express written consent of the dealer" and/or "take any action by contract, technical means, or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share, or use protected dealer data, including…imposing any fee or other restriction on the dealer or an authorized integrator for accessing or sharing protected dealer data or for writing data to a DMS."  (M.C.A § 30-11-718(1)(a)-(b)).)  The Montana legislature enacted another statute requiring "dealer data vendor[s]" (*i.e.*, DMS providers) to "provide access to open application programming interface to authorized integrators."  (M.C.A § 30-11-720(1)(b).)

***

62.     On September 28, 2022, CDK announced its "Data – Your Way" initiative, which would purportedly allow dealers to import and export data from their DMSs "at no charge" and "to work directly with their choice of independent software vendors for a growing number of specialized solutions in the market".  According to CDK's announcement, "CDK will transition away from the CDK Partner Program [also known as 3PA and SecurityFirst] and begin giving dealers and vendors the option to work directly with one another…"

**COUNT I**

**<u>Breach of Contract</u>**

63.     Priority 1 restates, re-alleges and incorporates by reference each of the allegations set forth above as if fully set forth herein.

64.     The MSA, including the Addenda, constitutes a valid and enforceable agreement between the parties.

65.     Priority 1 has performed all its obligations under the MSA and the Addenda.

66. CDK breached the Addenda by creating and providing revenue generating services through its new and "enhanced" data exchange program (under the SecurityFirst initiative), which used and/or relied on Priority 1's data.

67. Without Priority 1's data, CDK had nothing to "secure" through the SecurityFirst initiative and CDK's lockdown services.

68. CDK breached the Addenda every month it charged data access fees to Priority 1's third-party vendors (from approximately 2015-2022).

69. CDK breached the Addenda by disabling the user ids and passwords of Priority 1's third-party vendors.

70. As a consequence of CDK's creation and daily provision of mandatory "security" services through SecurityFirst, Priority 1 incurred additional and unnecessary costs from third-party vendors who were forced to pay CDK to access, and integrate with, Priority 1's DMS.

71. Priority 1 has been damaged by CDK's breaches of the Addenda in an amount no less than $1,029,059.78.

## COUNT II

## Unjust Enrichment

72. Priority 1 restates, re-alleges and incorporates by reference each of the allegations set forth above as if fully set forth herein.

73. CDK was unjustly enriched, at Priority 1's expense, through the monitoring and lockdown services, the mandatory enrollment in the CDK program via the eStore for access to the dealers' DMSs, and the regular charging of inflated prices for data integration.

74. SecurityFirst provided no new security enhancements to the existing CDK DMS and was nothing more than a blatant money grab.

75.     Statutes are being enacted to prohibit CDK and other DMS vendors from engaging in the same practices complained of in this case.

76.     As a direct and proximate result of CDK's unlawful and improper conduct, as set forth above, CDK has been unjustly enriched.  Priority 1 is therefore entitled, in the alternative only, to damages of no less than $1,029,059.78.

## PRAYER FOR RELIEF

WHEREFORE, Priority 1 respectfully requests that the Court enter judgment in favor of Priority 1:

(a)     Awarding damages to Priority 1 for CDK's breaches of the Addenda of no less than $1,029,059.78; or alternatively, awarding damages to Priority 1 for CDK's unjust enrichment of no less than $1,029,059.78;

(b)     Awarding reasonable attorneys' fees to Priority 1;

(c)     Awarding expenses, costs, and disbursements in this action, including prejudgment interest; and

(d)     Awarding such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Priority 1 hereby demands a jury trial on all issues.


August 5, 2024


By: _____ /s/ Donald W. Devitt _____

SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
Donald W. Devitt
30 West Monroe Street, Suite 1600
Chicago, IL  60603
(312) 255-7200
ddevitt@scopelitis.com

Carmine J. Castellano (*pro hac vice* forthcoming)
HODGSON RUSS LLP
605 Third Avenue, Suite 2300
New York, NY  10158
(212) 751-4300
ccastell@hodgsonruss.com

*Attorneys for Plaintiff Priority 1 Automotive Group,*
*Inc. d/b/a BMW of Towson*